779 A.2d 388

Janet **BEYER**

v.

**MORGAN STATE UNIVERSITY, et al.**

**No. 163, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Aug. 29, 2001.

610

612

David B. Allen of Columbia and Leonard A. Briscoe of Baltimore, for appellant.

Mark J. Davis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Morgan State and Arthur L. Drager on the brief, Betty Keat) all of Baltimore, for appellees.

Argued before MOYLAN*, WENNER*, EYLER, DEBORAH S., JJ.

EYLER, DEBORAH S., J.

The appellant, Janet Beyer, personal representative of the Estate of Betty Keat, challenges a judgment of the Circuit Court for Baltimore City vacating two orders of the Orphans' Court for Baltimore City. The appellees are Morgan State University ("MSU") and the Estate of Betty Keat ("Estate"). The appellant poses the following questions, which we have reworded, for review:

I.  Did the circuit court lack subject matter jurisdiction in that the orphans' court's orders were not appealable final judgments?

II.  Did the circuit court err in vacating the orphans' court's orders and granting summary judgment to MSU?

For the following reasons, we answer "No" to question I, "No" to question II with respect to the order of the orphans' court approving payment of an attorney's fee, and "Yes" to question II with respect to the order of the orphans' court approving payment of expenses. Accordingly, we shall affirm the judgment of the circuit court in part, reverse it in part, and remand the case to the circuit court for further proceedings.

## FACTS AND PROCEEDINGS

On January 12, 1996, several members of the Baltimore City Police Department entered Betty Y. Keat's house, at 326 Taplow Road, in Baltimore City, and shot her.[1] Ms. Keat was taken to the University of Maryland Shock Trauma Unit where she died later that day.

---

* Moylan, J., and Wenner, J., participated in the hearing and conference of this case while active members of this Court; they participated in the adoption of this opinion as retired, specially assigned members of this Court.

1.  The record does not disclose the circumstances of the shooting.

Ms. Keat ("the decedent") left a one-page last will and testament ("the Will"), dated January 25, 1982. The Will provided, *inter alia:*

1. House: to be sold. Proceeds to Morgan State University for repair of campus clocks.

2. Stocks, mutual funds, deferred compensation, pension. Converted to cash for litigation costs, if necessary, to enforce precedent provision. Any surplus to be donated towards fund to rectify heating plant of Soper library.[2]

The Will included other specific bequests of personalty, among them a gift of books about India to the Soper Library. It purported to leave to the University of Pennsylvania and the Hunter College Scholarship Fund sums that might accrue from the sale of certain real estate in West Virginia. It did not contain a residuary clause, address the payment of debts, or name a personal representative. .

The appellant was the decedent's sister and, upon the decedent's death, her sole heir at law. A few days after the decedent's death, the appellant contacted a lawyer, Anton J.S. Keating, Esquire, and retained him to investigate bringing a civil action against the police officers responsible for the shooting. Subsequently, also in January 1996, the appellant paid Keating a $2,500 retainer for that purpose.[3] Soon afterward, Keating arranged for David Allen, Esquire, to handle the probate case on behalf of the Estate and, as Keating put it in a letter to Allen, to "ensure that [the appellant] is the personal representative thereto."

On February 7, 1996, the appellant paid Keating an additional $2,500 retainer. Soon thereafter, the Will was admitted to probate and the appellant was appointed personal representative of the Estate. The next month, a claim was filed against the Estate by the Maryland State Department of

---

2. Soper Library is part of Morgan State University.

3. The exact date of the payment is not reflected in the record.

Health and Mental Hygiene for $34,921, for medical care rendered to the decedent at the Shock Trauma Unit.

On April 6, 1996, Allen wrote to Julie Goodwin, Esquire, General Counsel to MSU, informing MSU of the decedent's bequest to MSU. Allen's letter stated that he intended to investigate the circumstances of the decedent's death and that "funds from the [E]state will be needed for that undertaking, and any legal matters that may grow out of it." On April 24, 1996, Cecilia M. Assam, a paralegal with the Office of the President for MSU, responded in writing to Allen's letter, stating that, until MSU's bequest was distributed, MSU would object to the use of Estate funds for an investigation into the circumstances of the decedent's death. Assam commented, "[W]e do not understand why costs associated with those efforts take precedence over the Morgan bequest.... Moreover, the testator did not specify that funds from the [E]state be used for that purpose."

On April 29, 1996, the appellant paid Keating an additional $5,000 fee.

In June 1996, the appellant filed an inventory in the orphans' court listing the decedent's house, valued at $109,000, as the principal asset of the Estate. The inventory valued the Estate's total assets, including the house, at $111,127. It revealed that the stocks, mutual funds, deferred compensation, and pension referenced in the Will did not exist and that most of the decedent's personal property had been assessed as having no value, or *de minimis* value. (For example, jewelry bequeathed by the decedent to the appellant was valued at $22.)

Two weeks later, on June 28, 1996, the decedent's house was sold. The sale brought $95,045.44 in proceeds. MSU was not notified of the sale.

About two months after the decedent's house was sold, the appellant executed a written retainer agreement with Keating providing, *inter alia,* that

the legal fees [in the civil action against the police officers] shall not exceed $40,000.00, unless the client received an

award, judgment, or settlement in excess of $100,000.00, [appellant and attorney] agree that the attorney shall receive 33.33% of any such award, judgment, or settlement amount, with credit given for accrued attorneys' fees. The attorney's regular hourly rate is $150.00 per hour.

The appellant signed the agreement individually and not as the personal representative of the Estate. In October 1996, in the Circuit Court for Baltimore City, Keating, on behalf of the appellant, filed a civil action against the police officers involved in the fatal shooting.

Over a nine-month period, beginning September 10, 1996, and ending June 24, 1997, the appellant withdrew a total of $40,000 from the Estate. She used that money to pay Keating's fee in the civil action and to reimburse herself for the legal fees she already had paid Keating.[4] Neither the appellant, Allen, nor Keating sought or obtained the orphans' court's approval before using or accepting Estate funds for this purpose. In addition, none of them informed MSU or any interested person under the Will about the payments of legal fees to Keating with Estate funds.

Leonard Briscoe, Esquire, replaced Allen as the attorney for the Estate on October 15, 1996. The following August, Ms. Assam wrote to Allen (apparently not knowing that he had been replaced), asking whether he was "aware of the disposition of the property located at 326 Taplow Road and the books on India for the Soper Library." Allen did not respond to this letter.

On September 9, 1997, the appellant filed a first administrative account with the Register of Wills. It reflected, *inter alia*, the sale of the decedent's house on June 28, 1996, for $95,045.94. Nine days later, the Register of Wills returned the first administrative account, citing numerous deficiencies,

---

4. Keating was paid $20,000 on September 10, 1996, and $10,000 on June 24, 1997, from Estate funds. On November 19, 1996, the appellant used Estate funds to reimburse herself $10,000 for the payments she had made to Keating in January, February, and April 1996.

including not distributing Estate property in accordance with the terms of the Will.

### Expenses Petition

On February 4, 1998, the appellant filed in the orphans' court a "PETITION TO APPROVE EXPENDITURE OF EXTRAORDINARY EXPENSES OF ADMINISTRATION" ("Expenses Petition"), seeking approval for payment of Estate funds to her, her husband, and other friends and relatives of the decedent as reimbursement for expenses they allegedly had incurred in traveling to Baltimore to clean the decedent's house and ready it for sale. The appellant attached invoices from the friends and relatives, and from herself, listing the chores they had performed and the time they had spent traveling, and designating sums for labor, hotel expenses, meals, and other items. The amounts claimed were: the appellant—$3,261.58; Debra Cairns—$2,376; Stephen Cairns—$7,046.95; and William Beyer (the appellant's husband)—$625. The expenses totaled $13,309.53.

The Expenses Petition bore an undated "verification" [5] signed by the appellant as personal representative of the Estate and stating that notice had been given to all interested parties in accordance with Md.Code (1974, 2001 Repl.Vol.), section 7–301 of the Estates and Trusts Article ("ET"). It also bore a certificate of service signed by Briscoe stating that on February 10, 1998, the Expenses Petition had been mailed first class or delivered to, *inter alia,* "Morgan State University and Soper Library, Morgan State University—Hillen road [sic] & Coldspring [sic] Lane, Baltimore, Maryland 21212." (In fact, the zip code for MSU is 21234, not 21212.) The certificate of service also set forth a notice, citing Md. Rule 6–

---

**5.** As defined by Md.Code (1974, 2001 Repl.Vol.), section 1 102(b) of the Estates and Trusts Article, a "verification" must be signed by the person required to make it and must state: "I do solemnly declare and affirm under the penalties of perjury that the contents of the foregoing document are true and correct to the best of my knowledge, information, and belief." All documents containing recitations of fact and every inventory and account must be verified. *Id.* § 1–102(c).

416(c), that those to whom it was being sent could request a hearing on the petition within 20 days of receiving it.[6]

On March 11, 1998, the orphans' court issued an order continuing the Expenses Petition "pending the submission of verification, the signature of the personal representative, and certificate of service...." That order was docketed on March 16, 1998.

On April 20, 1998, apparently without any intervening activity, the orphans' court issued an order granting the Expenses Petition. On May 6, 1998, MSU filed an exception to the Expenses Petition. The exception was filed by counsel for MSU, and was the first entry of an appearance for MSU in the matter. The allegations set forth in the exception are written so as to reveal that MSU's counsel did not know when it was filed that the Expenses Petition already had been granted. Indeed, the allegations also make plain that MSU's counsel was unaware at that time that the decedent's house had been sold.

On a date that we are unable to ascertain from the record, the Register of Wills issued a "Notice of Hearing," scheduling MSU's exception to the Expenses Petition for a hearing on July 7, 1998. On June 3, 1998, however, Briscoe, on behalf of the Estate, filed a motion to strike MSU's exception, on the ground that it had not been timely filed and contained "inaccurate and false allegations."[7] The certificate of service for the

---

**6.** We shall refer in this opinion to the applicable rules as they existed in 1998. At that time, Md. Rule 6–416(c) provided:

Notice. The personal representative "shall serve on each unpaid creditor who has filed a claim and on each interested person a copy of the petition accompanied by a notice in the following form: Your are hereby notified that a petition for allowance of attorney's fees or personal representative's commissions has been filed. You have 20 days after service of the petition within which to file written exceptions and to request a hearing.

This provision now appears at section (a)(3) of the rule.

The notice appearing on the certificate of service for the Expenses Petition did not contain this full language.

**7.** Apparently, Briscoe attempted to file the motion to strike on May 21, 1998. It is stamped, "Returned 5/21/98" and "Received 6/3/98."

Estate's motion to strike is the first one bearing an address for MSU's counsel, Mark Davis, Esquire, as opposed to an address for MSU and the Soper Library. According to Davis, after he received the Estate's motion to strike, he reviewed the orphans' court's file and learned that the decedent's house had been sold two years earlier.

The July 7, 1998 hearing on the Expenses Petition never took place. Thereafter, by order of September 11, 1998, the orphans' court granted the Estate's motion to strike MSU's exception to the Expenses Petition.[8]

### *Attorney's Fee Petition*

On March 30, 1998, the appellant filed a "Petition for Attorney Fees" ("Attorney's Fee Petition"), alleging that in her capacity as personal representative of the Estate she had filed a "wrongful death" action against various Baltimore City police officers and, in connection with that litigation, had incurred attorney's fees totaling $40,000. The petition further stated, "[T]hese attorney fees are to be paid from the Estate of Betty Y. Keat." [9]

Notwithstanding the appellant's characterization of the nature of the civil action filed in October 1996, the action was not for "wrongful death"; rather, it was a survival action, brought by the appellant as personal representative of the Estate, under ET § 7–401(x). A survival action is a claim personal to the decedent that the decedent could have brought in his own right if he had lived. *Beynon v. Montgomery Cablevision Ltd. P'ship*, 351 Md. 460, 474, 718 A.2d 1161 (1998) (quoting *Stewart v. United Elec. Light & Power Co.*,

---

8. According to Davis, that order was not received by him until September 25, 1998. The envelope in which it was sent bears a September 24, 1998 postmark.

9. The record of the orphans' court contains a letter from Keating to the appellant, dated March 7, 1998, stating that a "Petition for Attorney Fee" is enclosed, to be filed with the court, and directing the appellant to sign it and forward it to Briscoe for filing.

104 Md. 332, 339–40, 65 A. 49, 52 (1906)). By contrast, a wrongful death claim is a statutory action on behalf of certain designated beneficiaries for damages for the death of the decedent. Md.Code (1973, 1998 Repl.Vol., 2000 Supp.) § 3–901, *et seq.*, of the Courts and Judicial Proceedings Article ("CJ"); *Lopez v. Maryland State Highway Admin.,* 327 Md. 486, 490, 610 A.2d 778 (1992) (citing *Stewart,* 104 Md. at 338–40, 65 A. 49). (In this case, there were no qualifying beneficiaries, so a wrongful death action could not lie.) In her survival action, the appellant alleged that the defendant police officers had illegally entered the decedent's house without a warrant and in the absence of exigent circumstances and shot her.

On April 6, 1998, almost a week after filing her Attorney's Fee Petition, the appellant filed a certificate of service, dated March 31, 1998, stating that the petition had been delivered or mailed to the persons listed, in accordance with ET § 7–302. MSU and Soper Library, "Hillen Rd. & Cold Spring Lane, Baltimore, MD. 21239[,]" were among those listed on the certificate of service.

On April 29, 1998, the orphans' court issued an order continuing the Attorney's Fee Petition pending submission of a verification, a certificate of service evidencing notice to all interested people, a detailed list of legal services performed, and a first and final administrative account. Thereafter, on a date that we cannot determine from the record, but necessarily on or after May 18, 1998, the appellant filed a certificate of service representing that on May 18, 1998, the Attorney's Fee Petition was mailed to a list of individuals and entities, including MSU and the Soper Library. By this time, Davis had filed the exception to the Expenses Petition on behalf of MSU, so his appearance was entered in the case. Nevertheless, the appellant's Attorney's Fee Petition was not sent to him. Also on a date that we cannot discern from the record, the appellant filed a verification of the contents of the Attorney's Fee Petition stating that notice of the Attorney's Fee Petition had been given to all interested parties pursuant to Md. Rule 6–

416(c).[10]

Keating filed a petition for extension of time in which to file an itemization of the legal services he had performed, so as to comply with the orphans' court's April 29, 1998 order.[11] His petition stated that he had just learned of that order. Then, on June 8, 1998, Keating filed his own "Petition for Allowance of Counsel Fees" ("Keating's Petition"). The certificate of service on Keating's Petition indicates that it was mailed to MSU and the Soper Library, and not to Davis as counsel for MSU. Keating's Petition has attached to it the appellant's verification and a May 18, 1998 certificate of service.

On June 9, 1998, the orphans' court issued an order extending by an additional twenty days the time for materials to be submitted under its April 29, 1998 order. On June 23, 1998, the orphans' court again ordered a continuance of the appellant's Attorney's Fee Petition, pending submission of her retainer agreement with Keating. It did not send this order to Davis. On July 3, 1998, the appellant submitted the retainer agreement and a verification to the orphans' court, together with detailed time records from Keating.

On July 8, 1998, MSU filed a Petition to Order Distribution of Property. It alleged, *inter alia,* that it had learned about the sale of the decedent's house six days earlier.[12] It further alleged that the proceeds of that sale had not been distributed to it in accordance with the terms of the Will and that its interest in the Estate could be diluted by payments of Estate funds to various persons without reasonable basis. Specifically, MSU stated that the appellant "propose[d] to pay an

10. The notice of service is not contained in the record.

11. In the record, the petition for extension is stamped "RECEIVED" April 18, 1998, several days before the orphans' court order. A hand-written notation on the copy in the record indicates that the petition was "actually filed on 5/19/98."

12. As indicated above, according to Davis, MSU learned of the sale of the house when Davis reviewed the orphans' court's record after receiving the Estate's motion to strike exception to the appellant's Expenses Petition.

attorney the sum of $40,000 for a wrongful death action for services which could have been secured on a contingent fee basis." It requested, *inter alia*, that the orphans' court stay any further expenditures pending court review and order distribution of the Estate property in accordance with the terms of the Will.

Neither the appellant's Attorney's Fee Petition nor Keating's Petition revealed that the appellant already had taken funds from the Estate and used them to pay Keating (directly and indirectly). Furthermore, it is evident from MSU's Petition to Order Distribution of Property that MSU did not know that the appellant already had used Estate funds to pay Keating's legal fee.

On September 9, 1998, the orphans' court entered an order granting the appellant's Attorney's Fee Petition and authorizing her to use Estate funds to pay "a counsel fee in the amount of $30,000 unto [Keating] for legal services rendered to the [E]state, subject to the notice requirements of Section 7–502 of the Estates and Trusts Article and Maryland Rule 6–416(c)[,] with leave to request additional payment after the case had been heard by the Circuit Court."

### Further Proceedings in the Orphans' Court

On September 29, 1998, the orphans' court held a hearing on MSU's "Petition to Order Distribution of Property." Davis attended the hearing on behalf of MSU. As he later told the circuit court, he learned that day of the filing and subsequent granting of appellant's Attorney's Fees Petition. The orphans' court did not rule on MSU's petition.

### Proceedings in Circuit Court

On October 1, 1998, MSU filed an appeal in the Circuit Court for Baltimore City from the September 9 and 11, 1998 orders of the orphans' court. In its memorandum in support of its appeal, MSU asked the circuit court to vacate the orders because the appellant "ha[d] violated her statutory duty pursuant to [ET] § 7–101(a) to settle the [E]state 'as expeditiously and with as little sacrifice of value as is reasonable under

the circumstances.'" At some point, which we cannot determine from the record, it had become known to MSU that the appellant already had used Estate funds to pay Keating's legal fee. In its circuit court appeal, MSU further alleged that the decedent's bequest to it had been improperly diluted by expenditures made by the Estate.

On January 4, 1999, Keating filed a motion in the circuit court asking, *inter alia*, that the court permit appellant to reimburse herself from Estate funds the full amount of his legal fee in the survival action. Keating acknowledged that, although he already had received full payment of his legal fee from the appellant, he had petitioned the orphans' court to allow his fee to be paid from the Estate so that the appellant could reimburse herself with Estate funds. (In fact, she already had done so.) According to Keating's motion, the appellant had made the following payments to him on the following dates:

| Retainer: | $ 2,500 |
|-----------|---------|
| 2/10/96 | $ 2,500 |
| 4/29/96 | $ 5,000 |
| 9/19/96 | $20,000 |
| 6/24/97 | $10,000 |
| Total: | $40,000 |

Two days later, on January 6, 1999, Keating moved the court to consolidate MSU's appeal from the orphans' court's orders with the survival action, captioned *Beyer v. Eldridge,* Circuit Court for Baltimore City, Case No. 96277005/CL218165, which was set for trial the following month, "so that the *de novo* appeal is heard immediately after the resolution of the civil litigation by the same Court." The motion to consolidate was granted the same day.

On January 15, 1999, the circuit court, *sua sponte,* appointed Arthur Drager, Esquire, to represent the interests of the Estate.

The survival action was tried before a jury and resulted in a defense verdict, on February 23, 1999. The next day, the circuit court held a hearing on MSU's *de novo* appeal from the

orphans' court's orders. At that time, the Estate contained approximately $50,000 in cash, and the claim by the Department of Health and Mental Hygiene remained unpaid and had not been disallowed by the appellant. Notwithstanding MSU's Petition to Order Distribution of Property, the appellant had not made any distribution to MSU.

At the outset of the hearing, Drager filed a memorandum of law on behalf of the Estate, setting forth its position. Drager argued that, by entering into an agreement with Keating to use Estate funds to pay Keating's attorney's fee in the survival action, the appellant had violated her fiduciary duty to "fairly consider the interests of interested persons and creditors." Drager pointed out that any award in the survival action would go to the Estate and, ultimately, because the Will did not contain a residuary clause, to the appellant, as the decedent's sole heir at law. He emphasized that because the Estate's assets consisted of the proceeds from the sale of the decedent's house, which were specifically bequeathed to MSU, and a few articles of nominal value, any money taken from the Estate and applied to Keating's fee necessarily would come from money intended for MSU. Thus, the appellant was using Estate funds earmarked as a bequest to MSU to finance litigation that might or might not produce a benefit and, if it did, would benefit only herself. By doing so, she was placing MSU's bequest at risk, thereby violating her fiduciary duty to fairly consider MSU's interests. Drager also argued that the appellant had violated her fiduciary duty by paying Keating out of Estate funds before receiving or even seeking the approval of the orphans' court.

Drager's memorandum also challenged the propriety of the orphans' court's order granting the Expenses Petition. He noted that there was nothing to indicate that the repairs and maintenance work for which the Expenses Petition sought reimbursement had been performed in the most cost effective manner and alleged that a number of the expenses and services for which payment had been sought were not extraordinary at all, but were of the type normally incurred in the administration of an estate and compensated through the

commission allowed to the personal representative by statute. According to Drager, the most the appellant could have received in commissions for administering the Estate was approximately $6,300, which is less than half of the amount requested in the Expenses Petition.

Drager, Briscoe, Keating, Davis, and the appellant attended the circuit court hearing. At one point, the court asked Davis what course of action MSU would take if the court were to vacate the orphans' court's orders. Davis replied:

I believe we would be permitted to access the bond which has been filed on behalf of the personal representative in this case. We would have a cause of action against the bond. If your honor permits us, ... to access the bond, we would proceed to recover the money on behalf of [MSU].[13]

When the court asked Drager his position on that issue, Drager stated that he had

no objection to the relief that's been sought by the attorney general's office, because on behalf of the Estate, with that relief granted and the bonding company then being bound, in effect, winding up[,] coming into this matter with the direction that they have to repay the sums that had been vacated, then the bonding company would then have the burden of deciding whether to proceed against the personal

13. Under ET 6–102(a), "every personal representative shall execute a bond to the State of Maryland for the benefit of all interested persons and creditors with a surety or sureties approved by the register[,]" except when excused or waived, which did not happen here, or when not required under certain circumstances not applicable to this case. Md. Rule 6–312(d) provides: "The liability of a surety on a bond may be enforced pursuant to Rule 1–404." Under that rule:

Upon the filing of a bond with the clerk any surety on the bond submits to the jurisdiction of the court and irrevocably appoints the clerk as agent to receive service of any papers affecting the surety's liability on the bond. The liability of a surety may be enforced on motion without necessity of an independent action. A motion filed pursuant to this Rule may be served on the clerk who shall promptly notify the surety by mailing a copy of the motion to the surety at the address provided on the bond. The court may provide additional notice to the surety.

representative and/or other to recover on that surety bond based upon how that contract is spelled out.

Thereafter, the court observed,

I don't think there is a factual dispute concerning what was done by this personal representative. I don't think it's disputed at all that these disbursements were made. I don't think that there is a dispute that these disbursements were made prior to the approval of the orphans' court ... I am concerned about [MSU] not even being put on notice after they filed an objection through the original attorney representing the [E]state.... In fact, forty thousand dollars was disbursed before approval was ever obtained, and even over objection, this disbursement was made without having a hearing. Mr. Davis, motions for summary judgment can be made at any time in a proceeding, and it can even be done orally.

Davis took the cue and moved for summary judgment on behalf of MSU. The court allowed Briscoe to respond, but asked him to identify any factual disputes about the timing and amounts of the disbursements, and the amount of commission appellant would have been entitled to be paid. Briscoe responded that he could not "see any factual disputes." Drager then gave Briscoe a copy of the memorandum he had prepared and the court allowed Briscoe to read it. After doing so, Briscoe reaffirmed his original statement that he could not "see that there is any issue of fact as far as stated."

Briscoe argued, however, that there was a factual dispute about whether MSU's clocks were in need of repair, which was the purpose for which the Will directed the bequest be made. The court rejected this argument, concluding that even if MSU's clocks currently were in good repair, MSU still could use the bequest for future clock repairs. Briscoe then argued that the amount of Keating's fee was reasonable. The court responded that the reasonableness of the fee was not relevant to the issue before it. The court then determined that there was no dispute of material fact and stated it was granting MSU's motion for summary judgment.

Two days later, on February 25, 1999, the court issued a written order vacating the September 9 and 11, 1998 orders of the orphans' court and granting summary judgment in favor of MSU. The court found that the appellant had "wrongfully expended [E]state funds in the amount of $40,000 for legal services to [Keating] in violation of her fiduciary duty under [ET] § 7–101(a) and without prior court approval" and had "wrongfully expended [E]state funds in the amount of $13,309.53 for extraordinary expenses."

The appellant noted a timely appeal to this Court.

## DISCUSSION

### I

The appellant first contends that the judgment of the circuit court must be vacated because the court lacked subject matter jurisdiction. She uses as the basis for her contention a point raised by MSU in the circuit court: that MSU was not given proper notice, under ET § 7–502(a) and Md. Rule 6–416, of the Attorney's Fee Petition or the Expenses Petition. Specifically, the appellant cites the language of ET § 7–502(a) to argue that if MSU did not receive proper notice of the petitions then the September 9 and 11, 1998 orphans' court's orders granting them never became final judgments from which an appeal to the circuit court could lie. She also argues that the order granting the Attorney's Fee Petition was not final because, by its terms, it permitted Keating to seek recovery of an additional $10,000 in the future.

MSU and the Estate respond that, irrespective of whether MSU was afforded proper notice of the petitions, the orphans' court's orders were final and appealable and, therefore, the circuit court had subject matter jurisdiction over the case.

We do not find any merit in the appellant's contention. It will help in explaining why, and in addressing her second contention, to review certain pertinent provisions of subtitle 7 of the Estates and Trusts Article.

ET § 7–101(a) establishes that the personal representative is a fiduciary, and sets forth his duties. The personal representative is "under a general duty to settle and distribute the estate of the decedent in accordance with the terms of the will and the estates of decedents law as expeditiously and with as little sacrifice of value as is reasonable under the circumstances." *Id.* He also has a number of specific duties, among which is to "file written accounts of his management and distribution of property at the times and in the manner prescribed [by law], with a certification that he has mailed or delivered a notice of the filing to all interested persons ." *Id.* § 7–301.

The personal representative has general and specific powers that are set forth by statute as well. *Id.* § 7–401. A personal representative who improperly exercises a power concerning the estate "is liable for breach of his fiduciary duty to interested persons for resulting damage or loss to the same extent as a trustee of an express trust." *Id.* § 7–403.

One of the specific powers of the personal representative is to "prosecute . . . actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted[,]" *i.e.*, a survival action. *Id.* § 7–401(y). *See* discussion, *supra.* Under ET § 7–603, entitled "Expenses of estate litigation," a personal representative who prosecutes or defends a proceeding on behalf of the estate "in good faith and with just cause . . . shall be entitled to receive his necessary expenses and disbursements from the estate regardless of the outcome of the proceeding." ET § 7–602(a) provides that "[a]n attorney is entitled to reasonable compensation for legal services rendered by him to the estate and/or the personal representative."

When an attorney has rendered services on behalf of the estate or the personal representative, either the personal representative or the attorney himself may file a petition in the orphans' court seeking allowance of payment of the legal

fee from the estate. The fee "shall be fair and reasonable in light of all the circumstances to be considered in fixing the fee of an attorney." *Id.* § 7–602(b). The decision to allow the payment of the attorney's fee is an exercise of discretion on the part of the orphans' court. *National Wildlife Fed'n v. Foster,* 83 Md.App. 484, 496, 575 A.2d 776 (1990) (quoting *Wolfe v. Turner,* 267 Md. 646, 653, 299 A.2d 106 (1973)).

ET § 7–502 and Md. Rule 6–416 govern the notice that must be given of a claim or other request that could result, directly or indirectly, in the payment, *inter alia,* of a "fee, or other compensation to or for the benefit of the personal representative or the attorney for the estate." ET § 7–502(a). The notice must be given to all interested persons, which includes a "legatee in being, not fully paid, whether his interest is vested or contingent," ET § 1–101(i)(3), and "shall state the amount requested ... [and] shall also state that a request for a hearing may be made within 20 days after the notice is sent." ET § 7–502(a); Md. Rule 6–416(c).

ET § 7–502(b) also contains language addressing the finality of an order allowing payment of a fee to the personal representative or attorney for the estate. This language is the focal point of the appellant's argument. The language states: "Unless there was fraud, material mistake, or substantial irregularity in the proceeding, or a request for a hearing is filed within 20 days of the sending of the notice, any action taken by the court on the petition is final and binding on all persons to whom the notice was given." Md. Rule 6–416(f) also addresses the finality of such an order. It states: "If timely exceptions are not filed, the order of the court allowing the attorney's fees or personal representative's commissions becomes final." The rule requires that a hearing be held if timely exceptions have been filed.

■ Appeals from the orphans' court to the circuit court are permitted by CJ § 12–502. They are *de novo,* which means that they are entirely new proceedings. CJ § 12–502(a)(1)(ii), (iii); *Lowenthal v. Rome,* 45 Md.App. 495, 413 A.2d 1360 (1980), *aff'd,* 290 Md. 33, 428 A.2d 75 (1981). In

such an appeal, "[t]he circuit court shall give judgment according to the equity of the matter." CJ § 12–502(a)(1)(iv).

Under CJ § 12–502(a)(1)(i), for an appeal to lie, the order of the orphans' court must constitute a final judgment. *See Grimberg v. Marth,* 338 Md. 546, 551, 659 A.2d 1287 (1995) (citing CJ § 12–501). The converse proposition is not stated but is implicit: an appeal may not be taken to the circuit court from an order of the orphans' court that does not constitute a final judgment. *Carrick v. Henley,* 44 Md.App. 124, 127–28, 407 A.2d 765 (1979). "A judgment generally is considered 'final' if it determines and concludes the rights involved, or denies the appellant the means of further prosecuting [his] rights and interests in the subject matter of the proceeding." *Hegmon v. Novak,* 130 Md.App. 703, 707, 747 A.2d 772 (2000); *see also* CJ § 12–101(f) (defining "final judgment" to mean "a judgment, decree, sentence, order, determination, decision, or other action by a court, including an orphans' court, from which an appeal, application for leave to appeal, or petition for certiorari may be taken").

As we have stated, the gravamen of the appellant's jurisdictional argument is that her failure to properly notify MSU of her petitions for payment of attorney's fees and expenses, under ET § 7–502(a) and Md. Rule 6–416, had the effect of making the orphans' court's orders granting those petitions non-final, and thus not appealable. We first shall address that contention with respect to appellant's Attorney's Fee Petition; in doing so, we shall assume for the sake of argument that that petition was not served on MSU as required by ET § 7–502(a) and Md. Rule 6–416(c), and that MSU did not learn of it until the September 29, 1998 hearing.

We apply the principles of statutory construction to enactments and court rules. *Cooper v. Sacco,* 357 Md. 622, 629, 745 A.2d 1074 (2000). "Every quest to discover and give effect to the objectives of the legislature begins with the text of the statute" or rule. *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088 (1999) (citing *In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012 (1994)). If the legislature's intentions are

evident from the text of the statute, our inquiry normally will end and the plain meaning of the enactment will govern. *See id.* (citing *State v. Montgomery*, 334 Md. 20, 24, 637 A.2d 1193 (1994)). When analyzing a statute or rule, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994) (citations omitted).

The language of ET § 7–502(b) and Md. Rule 6–416(c) cannot be interpreted reasonably to mean that unless and until proper notice is given, an order granting a petition for payment of attorney's fees (or a personal representative's commission) is not final for purposes of appeal. Under the appellant's reading of the pertinent language of ET § 7–502(b), an order granting such a petition would at one time be final as to creditors and interested parties who received proper notice and non-final as to those who did not; and that would be the case in the absence of any challenge to the order on that basis. This interpretation is practicably unworkable.

The appellant's interpretation also overlooks the procedure that governs the consideration and disposition of petitions of this sort under Md. Rule 6–416. That rule, at subsections (d), (e), and (f), specifies that, upon the filing of a petition for fees or commissions, the orphans' court "shall allow" the fees or commissions, "subject to any exceptions," and if exceptions are not filed within 20 days after service of the petition, the order "becomes final." (If exceptions are filed, the court must hold a hearing, and the order does not become final until after the hearing has taken place.) When this procedure is factored in, the most sensible interpretation of ET § 7–502(b) is that, once an order granting a petition for payment of fees or commissions has become final, it may be vacated for fraud, material mistake, or substantial irregularity in the proceeding or, upon the request of a person who was required to be given notice, for lack of or improper notice. This construction, which gives meaning to the language of the statute and the rule, is analogous to appellate interpretations of Md. Rule 2–535(b) and CJ § 6–408.

In this case, the order granting appellant's Attorney's Fee Petition was final on September 9, 1998, the day it was issued, because no exception was filed within 20 days of service of the petition. MSU could have moved to vacate the order on the ground that it did not receive service, or proper service, of the petition. Alternatively, it could have noted an appeal to the circuit court from the order, within 30 days of its issuance. CJ § 12–502(a)(1)(i). MSU opted to take a *de novo* appeal to the circuit court.

The order granting appellant's Attorney's Fee Petition was final, under ET § 7–502(b), and substantively, under CJ § 12–101(f), in that it was " 'so far final as to determine and conclude the rights involved in the action, or to deny to the party seeking redress by the appeal the means of further prosecuting or defending his rights and interests in the subject matter of the proceeding.' " *Grimberg,* 338 Md. at 551, 659 A.2d 1287 (quoting *In Re Buckler Trusts,* 144 Md. 424, 427, 125 A. 177 (1924) (citations omitted)); *Wright v. Nugent,* 23 Md.App. 337, 357, 328 A.2d 362 (1974) (holding that orders of the orphans' court that are subject to appeal are final orders that " 'actually settl[e] the rights of the parties.' " (quoting *Collins v. Cambridge Hosp.,* 158 Md. 112, 116, 148 A. 114 (1930)), *aff'd,* 275 Md. 290, 338 A.2d 898 (1975). The order in this case approved the immediate payment of $30,000 in legal fees to Keating. (Of course, because the money already had been taken by appellant from the Estate, the order in essence approved that which already had been done.) Thus, to the extent of that amount of Estate assets, the order actually settled the rights of the parties. The fact that the order gave Keating permission to seek additional sums in the future did not mean that its determination as to the $30,000 requested and approved was not final. *See National Wildlife Fed'n,* 83 Md.App. at 494–95, 575 A.2d 776 (order of orphans' court granting approval for payment of interim attorney's fees out of estate assets is final and appealable). Accordingly, the orphans' court's September 9, 1998 order was final and appealable, and the circuit court did not lack subject matter jurisdiction.

We reach the same conclusion with respect to the September 11, 1998 order pertaining to the appellant's Expenses Petition. The certificate of service for that petition was dated February 10, 1998. The orphans' court granted the petition on April 20, notwithstanding that it had continued the matter pending receipt of another certificate of service. Even assuming that MSU was not served properly with the Expenses Petition, at some point it learned of the petition (although apparently not about the order), and on May 6, 1998, it filed an exception. The Estate moved to strike MSU's exception, on the ground that it was not filed within 20 days of service of the petition. Ultimately, the orphans' court granted the motion to strike, on September 11, 1998. MSU filed its appeal within 30 days of that order.

As with the order granting the Attorney's Fee Petition, MSU could have moved to vacate the order granting appellant's Expenses Petition, on the ground that it was not afforded proper notice. The fact that it could have raised that argument in a motion to vacate in the orphans' court did not mean, however, that the order was not final, and thus not appealable to the circuit court. The order finally determined the rights of the parties respecting the payment of a fee to appellant, as the personal representative (as well as payments to others that were requested by her). Accordingly, it was a final judgment.

## II

The appellant contends that the circuit court erred in vacating the orphans' court's orders granting the Attorney's Fee Petition and the Expenses Petition and in doing so by way of summary judgment. We will address the court's ruling respecting each of the orphans' court's orders separately.

### *Attorney's Fee Petition*

The appellant criticizes the circuit court for failing to take evidence and make factual findings about the following issues respecting the orphans' court's order approving her Attorney's Fee Petition: 1) whether the survival action was

brought with just cause and in good faith; 2) whether MSU received proper notice of the petition (and, if not, whether any violation of the notice requirement was prejudicial); 3) whether Keating's fee was reasonable; and 4) whether there was justification for her using Estate funds to pay Keating without first obtaining the approval of the orphans' court. The appellant argues that these were genuinely disputed issues of material fact on which the court was required to take evidence and make factual findings before deciding whether to vacate the orphans' court order approving payment of Keating's fee.

As we have explained, an appeal to the circuit court from the orphans' court is a *de novo* proceeding, in which "the circuit court shall give judgment according to the equity of the matter." CJ § 12–502(a)(1)(iv). Indeed, in this context, the word "appeal" is something of a misnomer: the *de novo* circuit court trial permitted by CJ § 12–502(a)(1)(iv) is a new proceeding on the dispute that generated the order "appealed" from, not a proceeding in which the circuit court reviews the decision of the orphans' court. *Lowenthal,* 45 Md.App. at 498, 503, 413 A.2d 1360; *see also Estate of Soothcage v. King,* 227 Md. 142, 148, 176 A.2d 221 (1961) (holding that, because an "appeal" from the orphans' court to the circuit court is *de novo,* technical defects in the pleadings in the orphans' court are "of no importance on such a trial").

In the circuit court, a claim may be disposed of by summary judgment if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2–501; *see also Williams v. Mayor of Baltimore,* 359 Md. 101, 113, 753 A.2d 41 (2000). A motion for summary judgment may be filed "at any time." Md. Rule 2–501(a). In responding to the motion, the opposing party must identify " 'with particularity the material facts that are disputed.' " *Bond v. Nibco, Inc.,* 96 Md.App. 127, 136, 623 A.2d 731 (1993) (quoting Md. Rule 2–501(b)). Moreover, the opposing party must present evidence that would be admissible at trial to show the existence of a material factual dispute. *Bagwell v. Peninsula Regional Medical Center,* 106 Md.App. 470, 488,

665 A.2d 297 (1995) (citation omitted). A fact is material if its resolution will make a difference in the outcome of the case. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985) (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502 (1974)). We review the grant of summary judgment for legal correctness by determining the same two issues decided by the circuit court: was there a genuine dispute of material fact and, if not, was the moving party entitled to judgment as a matter of law? *Green v. H & R Block, Inc.,* 355 Md. 488, 502, 735 A.2d 1039 (1999) (citation omitted); *McCoy v. Hatmaker,* 135 Md.App. 693, 704, 763 A.2d 1233 (2000) (citations omitted), *cert. denied,* 364 Md. 141, 771 A.2d 1070 (2001).

In the instant case, it was undisputed that from September 10, 1996, to June 24, 1997, the appellant made withdrawals from the Estate totaling $40,000, and used that money to pay Keating's legal fee in the survival action, either by paying him sums directly or by reimbursing herself for sums she already had paid him; that she did not seek approval of the orphans' court to make those payments until almost a year after the final withdrawal and did not receive approval from the orphans' court for those payments until September 1998; and that when she finally petitioned the orphans' court for approval of the legal fees she did not disclose that she already had taken $40,000 from the Estate and used it for that purpose. It also was undisputed that before the appellant withdrew funds from the Estate to pay Keating, MSU, through its general counsel's office, had made it known to counsel for the Estate that it would object to any use of money earmarked for its bequest to investigate a survival action. Finally, it was undisputed that the appellant had failed to make any disbursements under the Will.

At the hearing, the appellant's counsel argued that, notwithstanding the foregoing, there was a genuine dispute of material fact as to whether Keating's fee was reasonable, given the nature of the survival action and the amount of time involved in prosecuting it. He did not argue, as he does now, that there were genuine disputes of material fact as to whether the survival action was brought with just cause and in good faith,

whether MSU properly received notice of the petition and/or was prejudiced by lack of notice, and whether the appellant's use of Estate funds to pay Keating without obtaining prior approval was justified. Moreover, he did not proffer any evidence or ask to call any witnesses on any of these topics. The circuit court ruled that the undisputed facts, as we have recited them above, were themselves a sufficient basis for it to find that the appellant's conduct was a breach of her fiduciary duties as personal representative and that other facts, even if genuinely disputed, were not material to that determination. The court decided to vacate the orphans' court's order approving the use of Estate funds to pay Keating's fee, on the ground that the appellant had already used Estate funds for that purpose, in breach of her fiduciary duties.

When MSU moved for summary judgment, it was incumbent upon the appellant not only to identify for the circuit court all of the genuine issues of material fact that she contended were in dispute, but also to proffer the evidence that would be admissible on those disputed issues. By not doing so, the appellant failed to preserve the arguments she now advances for review. *Boucher v. Riner*, 68 Md.App. 539, 551, 514 A.2d 485 (1986) (citing *Sherman v. American Bankers Life Assurance Co. of Fl.*, 264 Md. 239, 242, 285 A.2d 652 (1972)). Nevertheless, we will address all her arguments, if only to explain why we agree that, given the posture of the case before the circuit court and the issue the court was deciding, the facts and issues the appellant focuses on were not material to the court's ruling.

As we have explained, the personal representative of an estate has the discretionary power to bring a survival action, *i.e.*, an action that the decedent could have brought but for his death, for the protection or benefit of the estate. ET § 7–401(x); *see also Beynon*, 351 Md. at 474, 718 A.2d 1161 (quoting *Stewart*, 104 Md. at 339–40, 65 A. 49). To the extent that legal fees are incurred in connection with such an action, the personal representative (or the attorney) may petition the orphans' court for approval for payment of the fees, under ET

§ 7–602(b). When payment of the claim *could* result, directly or indirectly, in the payment of a fee to *or for the benefit of* the personal representative, proper notice must be given to interested parties, under ET § 7–502(a).

Clearly, the use of Estate funds to pay Keating's legal fee in the survival action could have benefitted the appellant. First, because the appellant had paid a portion of the fees directly, the use of Estate funds to pay Keating would serve to reimburse her. Second, she had personally contracted in the retainer agreement to pay the entire fee. Finally, as the decedent's sole heir at law, when the decedent's Will only made specific bequests and did not contain a residuary clause, the appellant could personally profit from a recovery of damages in the survival action. Accordingly, the payment of Estate money in legal fees to prosecute the survival action could benefit the appellant indirectly.[14]

If the circuit court had been ruling on the propriety *vel non* under ET § 7–602 of the application of Estate funds to pay Keating's legal fee in the survival action, without the appellant already having used Estate funds to pay the legal fee, three of the factual disputes the appellant claims existed would have been material and, if supported by admissible evidence, would have precluded the entry of summary judgment. Those issues—whether the survival action was brought with just cause

---

**14.** We disagree, to some extent, with MSU and the Estate that the appellant would have been the only beneficiary of a damage award in the survival action. A recovery could have been of no benefit to MSU or the appellant; of some benefit to MSU and not to the appellant; or of benefit to both MSU and the appellant. While the terms of the Will gave MSU the proceeds of the sale of the decedent's house, because the Will made no provision for the payment of debts and there was virtually nothing of value in the Estate except for the house sale proceeds, the payment of the $34,921 claim by the Department of Health and Mental Hygiene and any other claims or commissions would have come out of the bequest to MSU. A sizable recovery in the survival action could have resulted in MSU receiving its full bequest, without any subtraction for the payment of legal fees or the Department of Health and Mental Hygiene claim. Any recovery beyond the amount necessary to reimburse the Estate for the legal fees and to pay claims would have gone to the appellant, as the sole heir.

and in good faith, whether the fees were reasonable, and whether MSU received proper notice of the fee petition—were relevant to the propriety of the payment of Keating's legal fees with Estate funds in the first instance. That was not the issue before the circuit court, however, because the appellant already had taken $40,000 out of the Estate and used it to pay Keating, without ever having obtained approval of the orphans' court. Thus, the issue before the circuit court was whether the appellant's use of Estate money to pay Keating's legal fee and to reimburse herself for her prior payments to Keating, without seeking or obtaining prior approval of the orphans' court, was a violation of her fiduciary duties to MSU, as a legatee under the will.

In ruling that on the undisputed facts the appellant's actions constituted a violation of her fiduciary duties, the circuit court relied on *Attorney Grievance Commission v. Owrutsky*, 322 Md. 334, 587 A.2d 511 (1991). *Owrutsky* was a disciplinary action brought against a lawyer who served as the personal representative for the estates of two clients, a husband and wife. After both clients died, the lawyer took money from their estates to pay his legal fees, as attorney for the estate, and to pay his commissions, as personal representative, without first obtaining the approval of the orphans' court. With respect to some of the payments, the lawyer sought approval of the orphans' court after they were made, and eventually obtained approval. For others, he never sought approval at all.

The Court upheld the circuit court's factual findings and legal conclusion that the attorney's handling of the estates had violated the disciplinary rules. In doing so, it made observations about the responsibilities of fiduciaries that are equally applicable to the case at bar, notwithstanding the difference in context:

> There are two serious violations here. [The attorney] took fees ... from [the estates of the clients] without the approval of the Orphans' Court, and without accounting for those funds. Moreover, he took additional fees from each estate which, although later approved, had not been ap-

proved by the Orphans' Court at the time they were taken. [The attorney] treats this second violation as a rather minor matter. It is not. The funds held are those of the estate, and not those of the attorney. The attorney has no right to those funds, either as a commission or as an attorney's fee, unless and until an approval pursuant to § 7–601 or § 7–602 of the Estates and Trusts Article ... has been obtained from the Orphans' Court.

Fiduciaries in general, and attorneys in particular, must remember that the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds. Appropriating any part of those funds to their own use and benefit without clear authority to do so cannot be tolerated.

Arguing that an unauthorized "advance" was later approved as a fee is little better than arguing that a fiduciary may dip into the client's funds for a "loan" as long as the money is later repaid.

*Id.* at 344–45, 587 A.2d 511 (citing *Attorney Griev. Comm'n v. Pattison*, 292 Md. 599, 606, 441 A.2d 328 (1982) (holding that a "loan" taken by attorney from estate funds, although later repaid with interest, constituted "an inexcusable and unjustified breach of his fiduciary obligations to the estate and a serious invasion of the integrity of the assets of the estate")).

The appellant had no authority or discretion to use Estate funds to pay Keating's legal fee, to her personal benefit, without the prior approval of the orphans' court. Her conduct, like that of the lawyer in *Owrutsky*, amounted to an appropriation of Estate funds in clear violation of her fiduciary duties. The circuit court's finding in that respect was well supported by the undisputed facts.

The appellant's preemptive act of taking funds from the Estate and paying Keating obviated the factual considerations that would have been relevant to an inquiry under ET § 7–602, such as whether the survival action was brought with just cause and in good faith, the reasonableness of the fee, and

whether interested parties such as MSU properly were notified. As we have noted, for a dispute of fact to be material, it must relate to the grounds on which the decision rested. *Daniel v. Kensington Homes, Inc.*, 232 Md. 1, 13, 192 A.2d 114 (1963). These issues were not the grounds for the court's ruling that the appellant violated her fiduciary duties as personal representative by taking money out of the Estate to use for her personal benefit. To the extent that the appellant raises the issue of justification on appeal, having not argued it below, we will say only that there is no fact contained in the record or advanced in the appellant's brief, and no argument made by her, that could amount to a justification for her conduct.

### *Expenses Petition*

With respect to the Expenses Petition, the appellant argues that the court erred by not taking evidence and making factual findings about the need for the work for which the expenses were sought as reimbursement, whether the expenses were extraordinary, and whether her request for payment was justified because she had not filed a petition for commissions as personal representative.

MSU's request to vacate the orphans' court's order granting the Expenses Petition stood on a different footing than did its request to vacate the order approving the Attorney's Fee Petition. The appellant had not taken money out of the Estate to use to reimburse herself (and the others for whom she sought reimbursement) for the expenses she claimed were incurred in making the decedent's house ready for sale. Rather, in accordance with the law, she first petitioned the orphans' court for approval of payment of the expenses. Insofar as the record discloses, even after the orphans' court issued its order approving the Expenses Petition, the appellant did not use Estate money to pay herself and the others the expenses claimed. Thus, the question before the circuit court with respect to the Expenses Petition was not whether the appellant had violated her fiduciary duties but whether the expenses for which she sought, and in the orphans' court re-

ceived, payment approval were extraordinary expenses for which approval of payment would be warranted.

We agree with the appellant that the circuit court erred in failing to take evidence on this issue. As we see it, the circuit court treated MSU's request to vacate *vis-à-vis* the Expenses Petition as if the appellant had used Estate money to pay those expenses without first seeking or obtaining approval from the orphans' court, when that did not occur.

At the outset of the hearing before the circuit court, Drager, on behalf of the Estate, suggested in response to an inquiry by the court as to how to proceed that the appellant take the stand to testify about the expenses that were the subject of the "Expenses Petition," so the court could then determine the reasonableness of the expenses, whether all or part of them were "ordinary ministerial personal representative functions that are compensated through commissions," or whether all or part of them were extraordinary expenses for which the appellant may have been entitled to reimbursement. Later in the hearing, Briscoe made known that it was the appellant's position that *all* of the claimed expenses were extraordinary; Drager made known that it was the Estate's position that most of the expenses were ordinary, although some may have been extraordinary; and Davis made known that it was MSU's position that none of the expenses were extraordinary. Clearly, the evidence was in dispute, and testimony was required to resolve the question whether the appellant fairly was entitled to reimbursement for all or part of the extraordinary expenses she claimed were incurred in cleaning and otherwise preparing the decedent's house for sale.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY THE APPELLANT AND ONE–HALF BY THE APPELLEES.**